*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

STEVEN HAMILTON STREET II,

Defendant-Appellant.

UNPUBLISHED
June 11, 2025
12:04 PM

No. 362384
Kent Circuit Court
LC No. 20-003725-FC

Before: BOONSTRA, P.J., and REDFORD and MARIANI, JJ.

PER CURIAM.

Defendant, Steven Hamilton Street II, appeals as of right his jury trial convictions of two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(2)(b) (person less than 13 years old, defendant 17 years old or older); and one count of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a) (person less than 13 years old). The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to serve concurrent prison terms of 25 to 50 years for each CSC-I conviction, and 7 to 30 years for the CSC-II conviction. On appeal, defendant argues that the trial court abused its discretion by admitting certain evidence, that the prosecutor committed prejudicial misconduct, that defendant did not receive effective assistance of counsel, and that the investigating officer mishandled potentially exculpatory evidence. Finding no error requiring reversal, we affirm.

## I. BASIC FACTS AND PROCEEDINGS

The victim, AM, called defendant "Uncle Steve" because of his long-standing friendship with AM's family, her father in particular. On April 13, 2020, defendant visited AM's home, where he drank alcohol and smoked marijuana with AM's father while AM's mother tended to household tasks. According to testimony at defendant's trial, the men consumed enough tequila to be described as "very intoxicated." After the men had eaten, AM's father fell asleep at the kitchen table, and defendant sat on the couch with AM, who was playing a video game. When AM's mother finished eating, she went outside to smoke on the porch. She had just lit her cigarette when AM came outside and said that she thought something was wrong with Uncle Steve because he was "messing with his pants." When AM's mother asked AM what she meant, AM said that

-1-

defendant "was trying to undo his pants, he tried to pull my pants down." AM's mother recalled AM telling her that defendant pulled down AM's pants, licked her vagina and asked if it felt good, and lifted up her shirt and touched and licked her breasts. AM's mother testified that AM was acting "scared" and "nervous and afraid," as if she "didn't want to go back inside." AM was seven years old when these things took place.

AM's mother testified that she went back into the house and confronted defendant as he was preparing to leave, but he denied the allegations and left the house. After AM informed her father of the incident, AM's parents discussed what would be the right thing to do. AM's mother took AM to the police station that evening to report the incident. A detective assigned to the case the following day arranged for AM to undergo a forensic interview at the Children's Advocacy Center (CAC) and a forensic medical examination at the YWCA; both appointments were scheduled for April 15, 2020. During her forensic interview, AM described defendant touching and licking her nipples, licking her vagina, and digitally penetrating her vagina. Stephanie Solis, a registered nurse employed by the Grand Rapids YWCA as the Director of the Nurse Examiner Program, performed AM's forensic examination, which included collecting swabs of AM's mouth, vulva, anus, and right breast. Solis sent the swabs in a sexual-assault kit to the Michigan State Police Laboratory for analysis. Defendant was arrested and eventually charged, as indicated. The prosecution extended a plea offer. Defendant rejected the plea offer and went to trial after DNA results showed that defendant's DNA was on AM's right breast, along with the DNA of AM and one other contributor, but not on her genitalia.

At defendant's trial, AM testified that she was seven years old when defendant touched her in a way that made her feel uncomfortable and scared. AM recounted that defendant pulled down her pants and used his tongue to lick her vagina underneath her underwear. AM could not remember whether defendant touched any other part of her body. To refresh AM's memory of the forensic interview, the prosecutor used her laptop and a pair of headphones to show AM a three-minute excerpt from the interview at the CAC. The excerpt did not refresh AM's memory about the interview or help her remember whether defendant touched any part of her body other than her vagina. With the trial court's permission, and after defense counsel stated that he had "[n]o objection," the prosecutor played for the jury a portion of the videorecording of AM's forensic interview that was just under seven minutes long.

Nurse examiner Solis testified about her examination of AM, repeating without objection from the defense what AM and AM's mother told Solis during the examination. Solis reported that there were no physical injuries attributable to the incident and that she did not recommend any follow-up labs or medications, except for Motrin or Tylenol as needed for pain. Solis strongly encouraged therapy for AM and AM's parents. The detective in charge of the investigation testified about certain decisions that she made during the investigation; specifically, she recounted why the underwear that AM wore on the night of the incident was sent in a separate container to the Michigan State Police Laboratory instead of included in the sexual-assault kit. Because forensic scientists at the lab found male DNA on one of the swabs in the sexual-assault kit and were able to develop a DNA profile from that sample, it was policy for the scientists not to test any items sent in separate containers. Therefore, AM's underwear was not tested for defendant's DNA. Thomas Cottrell, an expert in child-sexual-abuse dynamics, testified about the variability in children's responses to sexual assault and the impact of trauma on memory. He explained that

memory of traumatic events could be fragmented and that immediate disclosure was more likely if the child anticipated a supportive response from a nonoffending parent.

Defendant testified, denying the allegations, and asserting that he was unaware of the accusations against him until his arrest a month after the incident. He described his relationship with the family and his presence at their home on the day of the incident. He acknowledged that he was intoxicated on the day of the incident, but he maintained that he did not engage in any inappropriate behavior. After deliberations and additional instructions from the trial court, the jury returned guilty verdicts on all charges. At sentencing, the trial court imposed the statutorily mandated minimum penalties for defendant's charges. Defendant now appeals.

## II. THE TESTIMONY OF NURSE EXAMINER SOLIS

Defendant first argues that the trial court plainly erred by admitting the hearsay statements of AM and her mother through the testimony of nurse examiner Solis because the statements did not meet the requirements of MRE 803(4).[1] Alternatively, defendant contends that defense counsel rendered ineffective assistance when he failed to object to Solis's hearsay testimony. We disagree.

We review unpreserved claims of error for plain error affecting a defendant's substantial rights. *People v Allen*, 507 Mich 597, 604; 968 NW2d 532 (2021). To avoid forfeiture under the plain-error rule, a defendant must establish that error occurred, that "the error was plain, i.e., clear or obvious," and that the plain error affected the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). The latter generally requires the defendant to show that the error affected the outcome of the lower court proceedings. *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. (quotation marks, citation, and alteration omitted).

As to the ineffective assistance claim, a defendant must move for a new trial or an evidentiary hearing to preserve this claim. See *People v Sabin* (*On Second Remand*), 242 Mich App 656, 658-659; 620 NW2d 19 (2000). Because defendant failed to do so, this Court's review is limited to errors apparent on the record. See *People v Seals*, 285 Mich App 1, 19-20; 776 NW2d 314 (2009). Whether defendant was denied effective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review the trial court's findings of fact, if any, for clear error and review questions of constitutional law de novo. *People v Abcumby-Blair*, 335 Mich App 210, 227-228; 966 NW2d 437 (2020).

Hearsay "is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is not admissible except as provided by the rules of evidence. MRE 802. One such

---

[1] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of trial.

exception to the prohibition against hearsay is for statements made for purposes of medical treatment or diagnosis in connection with medical treatment. MRE 803(4) provides that the following statements are not excluded by the hearsay rule:

> Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment.

"All exceptions to the hearsay rule are justified because of the belief that the statements are made under circumstances in which they are both necessary and inherently trustworthy." *People v Duenaz*, 306 Mich App 85, 95; 854 NW2d 531 (2014). The "rationale for MRE 803(4) [is] the existence of (1) the self-interested motivation to speak the truth to treating physicians in order to receive proper medical care, and (2) the reasonable necessity of the statement to the diagnosis and treatment of the patient." *People v Meeboer (After Remand)*, 439 Mich 310, 322; 484 NW2d 621 (1992). The critical questions in the present case are whether AM's statements were reasonably necessary for diagnosis and treatment and if AM had a self-interested motivation to be truthful in order to receive proper medical care.

Even when there is no immediate evidence of physical injury, sexual assault can involve different types of harm, such as "sexually transmitted disease, immune deficiency virus, or psychological trauma," that "are impossible to detect at first but still require diagnosis and treatment." *People v Garland*, 286 Mich App 1, 9-10; 777 NW2d 732 (2009). In the present case, although AM did not present with any physical injuries, AM's statements to Solis regarding defendant's alleged actions fell within the scope of MRE 803(4) because the examination was in regard to allegations of sexual assault and Solis testified that the information she collected guided her examination and helped her make a diagnosis and treatment plan relevant to AM. In addition, knowing the circumstances and nature of the assault, including the identity of the perpetrator, may have been necessary for Solis to assure the safety of the patient. See *Meeboer (After Remand)*, 439 Mich at 322 ("[T]he identification of the assailant is necessary to adequate medical diagnosis and treatment."). The fact that Solis's examination of AM was conducted in part to collect evidence of a sexual assault was not dispositive. See *Duenaz*, 306 Mich App at 96. For these reasons, AM's statements to Solis were reasonably necessary for diagnosis and treatment.

Evidence also supports that AM had a self-interested motivation to be truthful in order to receive proper medical care. For declarants under 10 years of age, our Supreme Court identified the following factors to consider when determining whether a declarant's statement is trustworthy:

> (1) the age and maturity of the declarant, (2) the manner in which the statements are elicited (leading questions may undermine the trustworthiness of a statement), (3) the manner in which the statements are phrased (childlike terminology may be evidence of genuineness), (4) use of terminology unexpected of a child of similar age, (5) who initiated the examination (prosecutorial initiation may indicate that the examination was not intended for purposes of medical diagnosis and treatment), (6) the timing of the examination in relation to the assault (the child is still suffering pain and distress), (7) the timing of the examination in relation to the trial (involving

the purpose of the examination), (8) the type of examination (statements made in the course of treatment for psychological disorders may not be as reliable), (9) the relation of the declarant to the person identified (evidence that the child did not mistake the identity), and (10) the existence of or lack of motive to fabricate. [*Meeboer (After Remand)*, 439 Mich at 324-325.]

Although the *Meeboer* factors "are neither inclusive nor exclusive, an analysis of the available evidence can support an application of MRE 803(4) even where it is not apparent that the child understood that statements must be truthful in order to receive proper care." *Id*. at 326.

In the present case, AM was seven years old at the time of the offense. Solis testified that she asked very open-ended questions, although she acknowledged that she got AM to talk by telling AM that AM's mother said that something happened with defendant. AM testified that she called her private parts "vagina" and "nipples." AM used similar language during the forensic examination, and there was no evidence presented or argument made that how she referred to her private parts was not age-appropriate. The examination occurred two days after the assault. Although there was no physical manifestation of injury, AM said that she did not want to talk about what happened, and she later told Solis that she was afraid that defendant might come back to her house and do the same thing again. This suggested that AM may have still been operating under the emotional distress of the incident. See *People v Johnson*, 315 Mich App 163, 194-195; 889 NW2d 513 (2016). The examination occurred two days after AM's initial disclosure and nearly two years before defendant's trial. Usually, this would tend to show that the exam was not for litigation purposes. See *id*. at 195. Solis conducted a medical, as opposed to a psychological, examination. The record shows that AM knew defendant well enough to call him "Uncle Steve," so there was no chance of misidentification. Absent from the record is any evidence that AM had a motive to fabricate. The only *Meeboer* factor that weighs against a finding that AM's statements were trustworthy is record evidence that the examination was initiated by the police.

On the basis of the foregoing analysis, we conclude that the totality of the circumstances supports the admission of AM's statements because they were trustworthy. Accordingly, defendant has not shown that the trial court committed plain error by allowing Solis to testify about AM's statements during the forensic medical examination.

Defendant's claim of ineffective assistance of counsel on the basis of defense counsel's failure to object to Solis's hearsay testimony also fails. To establish ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. See *Smith v Spisak*, 558 US 139, 149; 130 S Ct 676; 175 L Ed 2d 595 (2010); *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2025; 80 L Ed 2d 674 (1984). Effective assistance of counsel is presumed, and defendant bears a heavy burden to prove otherwise. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999).

Defendant contends that defense counsel was ineffective for failing to object to Solis's testimony. However, failing to make a futile objection does not constitute ineffective assistance of counsel. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Because Solis's

testimony regarding what AM told her was admissible under MRE 803(4), any objection to the testimony would have been futile. See *id*. For this reason, defendant's claim of ineffective assistance arising from defense counsel's failure to object to Solis's hearsay testimony must fail.

Lastly, defendant asserts in his Standard 4 brief[2] that Solis's use of the word "assault" and her insinuation that she diagnosed AM with "sexual assault" was plain error that prejudiced defendant by bolstering AM's veracity and interfering with the jury's role to determine the credibility of the witnesses.

"An examining physician cannot give an opinion on whether a complainant had been sexually assaulted if the 'conclusion [is] nothing more than the doctor's opinion that the victim had told the truth.' " *People v Thorpe*, 504 Mich 230, 262; 934 NW2d 693 (2019) (alteration in original), quoting *People v Smith*, 425 Mich 98, 109; 387 NW2d 814 (1986). In the present case, Solis did not give an opinion on whether AM had been sexually assaulted, and defendant does not cite any authority for the proposition that using the word "assault" under these circumstances was plain error. Even if we assumed for the sake of this discussion that Solis's frequent references to "the assault" constituted plain error, defendant has not shown that use of the word was outcome-determinative. See *Carines*, 460 Mich at 763.

In the present case, Solis's testimony was largely cumulative to the testimonies of AM and her mother, both of whom testified and were subject to cross-examination. See *People v Gursky*, 486 Mich 596, 620; 786 NW2d 579 (2010). Although Solis used the word "assault," she also testified that no physical evidence corroborated AM's claims and that AM did not require any treatment or medication. Solis also indicated that AM told her that defendant put his hands down her pants only; AM did not tell Solis that defendant inserted his finger between the lips of her vagina. In addition, the jury watched a properly admitted portion of AM's forensic interview (discussed later), in which she said that defendant digitally penetrated the "folds" of her vagina. The videorecording of the forensic interview provided the only evidence of penetration, and the jury's conviction of defendant for the CSC-I count on the basis of digital/vaginal penetration suggests that the jury found AM credible. That AM and her mother testified and were subject to cross-examination, and the strength of untainted evidence, particularly the videorecording of AM's forensic interview, likely rendered Solis's testimony "of less importance and less prejudicial," *id*. at 621. For this reason, even if we assumed Solis's testimony constituted plain error, that testimony was unlikely to affect the outcome of the lower court proceedings.

## III. RECORDED RECOLLECTION

Defendant also argues that the trial court plainly erred by allowing the prosecution to play for the jury a portion of AM's videorecorded forensic interview as a recorded recollection under MRE 803(5). We need not consider whether the trial court erred because defense counsel's statement that he had no objection to playing the videorecording constituted a waiver that extinguished any claim of error arising from the court's error. See *People v Carter*, 462 Mich 206, 215-216; 612 NW2d 144 (2000). Alternatively, defendant argues that defense counsel rendered

---

[2] A "Standard 4" brief refers to a brief filed on behalf of an indigent criminal defendant under Michigan Supreme Court Administrative Order 2004-6, Standard 4.

ineffective assistance when he failed to object to the video. We disagree. As already indicated, because an evidentiary hearing was not held, this Court's review of defendant's claim of ineffective assistance is limited to errors apparent on the record. See *Seals*, 285 Mich App at 19-20.

MRE 803(5) provides an exception to the prohibition against hearsay as follows:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter is fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

As articulated in the rule, the foundational requirements that must be met before a memorandum or record may be admitted under MRE 803(5) are:

> (1) The document must pertain to matters about which the declarant once had knowledge; (2) The declarant must now have an insufficient recollection as to such matters; (3) The document must be shown to have been made by the declarant or, if made by one other than the declarant, to have been examined by the declarant and shown to accurately reflect the declarant's knowledge when the matters were fresh in his memory. [*People v Daniels*, 192 Mich App 658, 667-668; 482 NW2d 176 (1991) (quotation marks and citation omitted).]

The admissibility of the forensic-interview video depends on whether MRE 803(5)'s foundational requirements were met. Defendant concedes that MRE 803(5) applies to videorecordings and that the first two requirements were met: the forensic-interview video pertained to matters about which AM once had knowledge, and AM's recollection of such matters at trial was insufficient. Defendant argues, however, that the third foundational element was not met because, although AM "indicated that she was 'telling the truth' when she talked to the interviewer," AM never indicated that she "adopted the video as her own recorded recollection" or vouched for its accuracy. The prosecution responds that examination of the video and vouching for its accuracy are not required when the witness made the video. See *People v Dinardo*, 290 Mich App 280, 293; 801 NW2d 73 (2010). The prosecution is correct.

To satisfy the third foundational requirement, the prosecution had to show that AM made the videorecorded statements or, if someone other than AM made the statements in the videorecording, that AM examined the videorecording and determined that the statements therein accurately reflected her knowledge when the April 13, 2020 incident was fresh in her memory. See *Daniels*, 192 Mich App at 667-668. The third foundational requirement for admitting the videorecording under MRE 803(5) was satisfied when AM confirmed that it was her in the forensic-interview videorecording; the statements in the forensic-interview videorecording were not prepared by someone else, but were AM's own recorded statements. AM's testimony that she told the truth arguably went to the weight of the evidence, not to its admissibility. MRE 803(5)'s foundational requirements having been met, the videorecording of AM's forensic interview was

admissible as a recorded recollection, and defense counsel did not render ineffective assistance by failing to object to its admission.  See *Ericksen*, 288 Mich App at 201.

Next, defendant argues in his Standard 4 brief that the trial court erred by playing a portion of AM's forensic interview for the jury during deliberations.  We agree that the trial court committed plain error by playing the video during deliberations, but we cannot say that the error affected the outcome of the proceedings.  We review this unpreserved issue under the plain-error standard of review.  See *Carines*, 460 Mich at 763.

If the foundational requirements are met, then MRE 803(5) allows a recorded recollection to be read into evidence, but a recorded recollection may not be received as an exhibit unless offered by an adverse party.  The prosecutor made clear that MRE 803(5) prohibited her from entering the videorecording into evidence, and there is no indication that defendant admitted it into evidence.  The trial court instructed the jury that it could "only consider the evidence properly admitted in this case," and the court defined "evidence" to include "only the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence."  The videorecording was not sworn testimony and was not admitted into evidence, and the trial court did not instruct the jury to consider the recording as evidence.  Therefore, the trial court erred by allowing the prosecutor to play the audio portion of the videorecording during deliberations, in violation of MRE 803(5), and the error was plain.  See *id*.

Nevertheless, defendant is not entitled to relief because he has not met his burden to show that the error affected the outcome of the lower court proceeding or "seriously affected the fairness, integrity or public reputation of judicial proceedings . . . ." *Id*. at 763-764.  As already indicated, the videorecording was properly admitted under MRE 803(5) and a portion of it was shown to the jury during trial.  Therefore, allowing the jury to listen a second time to the audio portion of the recording was cumulative.  See *United States v Jones*, 601 F3d 1247, 1264 (CA 11, 2010).[3]  In addition, although the videorecording contained the only evidence to support the CSC-I charge on the basis of digital penetration, it does not appear that the jury was swayed by hearing the audio a second time.  After hearing the audio and deliberating further, the jury informed the court that it could not reach a verdict on one of the charges.  Had the jury immediately returned with a verdict after hearing the audio, it might suggest that the audio swayed the jury and, therefore, affected the outcome of the proceeding.  Given the absence of any indication that the audio's replay helped jurors reach agreement on the charge that they were deadlocked on, the record does not support that the second playing of audio of AM's forensic interview affected the outcome of the proceeding.  See *id*.  Accordingly, defendant is not entitled to relief on this issue.

---

[3] "Because the Michigan Rules of Evidence in general parallel the text of the federal rules on which the state committee's product was based, [the Michigan Supreme Court has found] helpful and, in some instances persuasive, commentary and case law that refers to the Federal Rules of Evidence." *People v VanderVliet*, 444 Mich 52, 60 n 7; 508 NW2d 114 (1993), amended in nonrelevant part 445 Mich 1205 (1994).

## IV. PROSECUTORIAL ERROR

Defendant contends that prosecutorial misconduct[4] violated his right to due process. We again disagree.

Defendant concedes that this issue is not preserved; therefore, our review is under the plain-error standard. See *Allen*, 507 Mich at 604. In addition, we "will not find error requiring reversal if the prejudicial effect of the prosecutor's comments could have been cured by a timely instruction." *People v Williams*, 265 Mich App 68, 71; 692 NW2d 722 (2005).

The test for prosecutorial error is whether the criminal defendant has been denied a fair trial. *People v Rodriguez*, 251 Mich App 10, 29-30; 650 NW2d 96 (2002). We review claims of prosecutorial error on a case-by-case basis, examining the pertinent portion of the record and evaluating a prosecutor's remarks in context. *Id*. The defendant bears the burden of demonstrating that prosecutorial error resulted in a miscarriage of justice. *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). "The cumulative effect of several minor errors may warrant reversal even where individual errors in the case would not." *People v McLaughlin*, 258 Mich App 635, 649; 672 NW2d 860 (2003).

Defendant first asserts that the prosecutor erred by compelling him during cross-examination to give an opinion about the credibility of other witnesses, as illustrated in the following exchange:

> *Q*. [*Prosecuting Attorney*]: Your relationship was good with all three of those members of [AM's] family on April 13?
>
> *A*. [*Defendant*]: Yes.
>
> *Q*. But now [AM and her mother] are just making this all up?
>
> *A*. I don't know.
>
> *Q*. Because back when you spoke with [the investigating detective] you said there was no reason for [AM] to lie; right?

---

[4] This Court has noted that while "the phrase 'prosecutorial misconduct' has become a term of art in criminal appeals, . . . these claims of error might be better and more fairly presented as claims of 'prosecutorial error,' with only the most extreme cases rising to the level of 'prosecutorial misconduct.' " *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). Because defendant's allegations involve conduct, that even if error, would not rise to the level of professional misconduct, we use the term "prosecutorial error" to refer to defendant's claims. Our quotation of caselaw using the term "prosecutorial misconduct" should be understood to include claims of prosecutorial error.

*A*. I would hope not. I wouldn't—when—at the time I would not think that she would do that. But that would be very strange to me, that this whole thing is strange to me.

Our Supreme Court held in *People v Buckey*, 424 Mich 1, 17; 378 NW2d 432 (1985), that is it improper for a prosecutor to ask a defendant on cross-examination to comment on the credibility of other witnesses. In *Buckey*, the prosecutor reminded the defendant about the testimonies of two witnesses and asked the defendant whether he thought that the witnesses were lying; the prosecutor also asked whether the defendant thought that four boys who had testified against him were lying. *Id*. at 7 n 3. The defendant indicated that he thought one of the witnesses was lying, but that the others were not telling the entire truth. *Id*. The Michigan Supreme Court determined that it was improper for the prosecutor to ask the defendant to comment on the credibility of the witnesses because the defendant's opinion of their credibility was not relevant. *Id*. at 17. Nevertheless, the Court did not believe that the error resulted in unfair prejudice to the defendant because the defendant "dealt rather well with the questions." *Id*. The Court also noted that reversal was not warranted because a timely objection would have cured any prejudice. *Id*. at 18.

In the present case, the prosecutor first asked defendant whether he thought that two witnesses were making up the allegations against him. Viewed in isolation, this question asked defendant to comment on the credibility of prosecution witnesses. However, the prosecutor's follow-up question about defendant's statement to the investigating detective made the exchange more about defendant's credibility than about defendant's opinion of AM's and AM's mother's credibility: defendant initially said that AM had no reason to lie, now he seemed to be implying something different. Viewed in context, this exchange was not improper. Moreover, defendant "dealt rather well with the question[]." *Id*. at 17. Defendant said that he did not know whether the witnesses were making up the allegations, reiterated that he did not think when he spoke with the detective that the witnesses would make up allegations, and he expressed confusion about "this whole thing." In addition, "[a] timely objection by defense counsel could have cured any prejudice . . . ." *Id*. As such, defendant was not denied a fair trial.

Defendant further alleges that the prosecutor erred during her closing argument by arguing as follows:

[A]nd importantly and I ask you to keep it in mind really at all points during your deliberations, what is [AM's] motive to lie? What is the motive to lie on behalf of [AM's] family at all?

And, I submit to you there is none.

* * *

. . . No evidence whatsoever during the course of this trial has established any sort of motive to lie whatsoever. You know, [defense counsel] at certain points talked about, maybe with Mr. Cottrell like a divorce situation or things like that. Could there be a motive to lie in certain cases? Sure. But here there's been absolutely nothing to show why [AM's mother] would want her daughter to go

-10-

through all this. Or why [AM] would come in here and lie. There's been zero evidence of any motive to lie on behalf of [AM's] family.

Defendant alleges the prosecutor's argument distorted the prosecution's burden of proof by suggesting that the jury had to find that prosecution witnesses deliberately lied in order to acquit defendant.

Having reviewed the challenged argument, we conclude that the prosecutor's comments are reasonably viewed as inviting the jury to consider the facts and conclude that AM was credible. A prosecutor may "argue from the facts that a witness is credible . . . ." *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997). In addition, to the extent that there was any chance that a juror viewed the prosecutor's comments in the same light as defendant, the trial court's instructions would have corrected this error. The trial court instructed the jury that it was to presume that defendant was innocent; that the prosecutor had the burden to prove each element of the charged crimes beyond a reasonable doubt; and that if the prosecutor did not meet this burden, the jury must find defendant not guilty. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). See also *Weeks v Angelone*, 528 US 225, 234; 120 S Ct 727; 145 L Ed 2d 727 (2000).

Defendant raises two additional claims of prosecutorial error in his Standard 4 brief. First, he asserts that prejudicial remarks and questions about his level of intoxication on April 13 constituted prosecutorial error. Specifically, defendant contends that the prosecutor prejudiced defendant with her remark that defendant's level of intoxication was 11 out of 10 and with questions implying that what he told the investigating detective about his level of intoxication on April 13 differed from his trial testimony. These claims of error are without merit.

The prosecutor may fairly contest the evidence produced by the defense, which includes cross-examining a defense witness on any matter that bears on his or her credibility. See *People v Reid*, 233 Mich App 457, 475-478; 592 NW2d 767 (1999). In the present case, AM's father testified that he and defendant were comparably intoxicated, and both men testified that their levels of intoxication were 6 out of 10. But there was conflicting testimony about how much tequila the men consumed and whether AM's father had consumed enough alcohol that he passed out at the kitchen table and was difficult to rouse. In addition, defendant testified that he sat on the couch in the home because he did not feel that he was fit to drive, and he seemed to imply that his level of intoxication prevented him from responding to AM's attempts to interest him in the video game that she was playing. In light of defendant's testimony, the prosecutor could cross-examine defendant on his testimony regarding his level of intoxication on April 13 because it bore on his credibility. See *id*. In addition, any prejudice arising from the prosecutor's questions was arguably cured by the trial court's instruction to the jurors that they could only consider the evidence properly admitted in the case, and the attorneys' questions to the witnesses were not evidence. See *Abraham*, 256 Mich App at 279.

Next, defendant contends that by asking him how his DNA ended up on AM's body, the prosecutor impermissibly shifted the burden of proof from the prosecution to the defense. We disagree. While the prosecution is not permitted to ask questions that would shift the burden to the defendant, the prosecution is permitted to challenge a theory advanced by the defense:

-11-

[W]here a defendant testifies at trial or advances, either explicitly or implicitly, an alternate theory of the case that, if true, would exonerate the defendant, comment on the validity of the alternate theory cannot be said to shift the burden of proving innocence to the defendant. Although a defendant has no burden to produce any evidence, once the defendant advances evidence or a theory, argument on the inferences created does not shift the burden of proof. [*People v Fields*, 450 Mich 94, 115; 538 NW2d 356 (1995).]

In the present case, defendant testified that he was confident his DNA would not be present on AM's genitalia. The defense also advanced an alternate explanation why defendant's DNA was found on AM's breast. In this alternate theory, defendant's DNA ended up on AM's breast because he touched a wound AM showed him earlier in the day. The prosecution was permitted to challenge the defense theory regarding the presence of defendant's DNA on AM's body. By challenging this defense theory, the prosecution was not suggesting that defendant was required to prove his innocence, but only that his version of events was not credible based on the evidence presented. See *id*.

Moreover, the trial court's instructions to the jury cured any error. See *Abraham*, 256 Mich App at 279. As already indicated, the trial court told the jurors that they could only consider the evidence properly admitted in the case and that the attorneys' questions to the witnesses were not evidence. The trial court also instructed the jury that it was to presume that defendant was innocent, that the prosecutor had the burden to prove each element of the charged crimes beyond a reasonable doubt, and that defendant was "not required to prove his innocence or to do anything." Defendant has failed to show that the prosecution committed error requiring reversal.

## V. JURY INSTRUCTIONS

Defendant also contends that, although consistent with standard jury instructions, the trial court's instruction on reasonable doubt, M Crim JI 3.2(3), inadequately defined the concept for the jury and effectively shifted the prosecutor's burden of proof.

To preserve a claim of instructional error, a defendant must object to the instruction before the jury deliberates. MCR 2.512(C); *People v Gonzalez*, 256 Mich App 212, 225; 663 NW2d 499 (2003). However, "[a] party's explicit and express approval of jury instructions as given waives any error and precludes appellate review." *People v Spaulding*, 332 Mich App 638, 653; 957 NW2d 843 (2020). When asked by the trial court whether he had "anything about the instructions or anything else," defense counsel responded, "Not from Defense Counsel, Judge." This express approval of the jury instructions as given waived any error and precludes this Court's review. See *id*. Accordingly, we decline to address this issue, beyond stressing that this Court has found that M Crim JI 3.2 (formerly CJI 3.2) adequately expresses the concept of reasonable doubt. See, e.g., *People v Hubbard (After Remand)*, 217 Mich App 459, 487; 552 NW2d 493 (1996), overruled in part on other grounds by *People v Harris*, 495 Mich 120 (2014) and *People v Bryant*, 491 Mich 575 (2012).

## VI. ADDITIONAL ARGUMENTS FROM DEFENDANT'S STANDARD 4 BRIEF

## A. VOUCHING

Defendant next contends that the trial court erred by admitting expert witness testimony that improperly bolstered AM's credibility. We disagree.

Because defendant failed to preserve this issue for review by objecting at trial, our review is for plain error affecting defendant's substantial rights. See *Thorpe*, 504 Mich at 252.

In sexual-abuse cases, an expert witness may not (1) "testify that the sexual abuse occurred," (2) "vouch for the veracity of a victim," or (3) "testify whether the defendant is guilty." *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857 (1995). Nevertheless, an expert "may testify regarding typical symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an abuse victim *or* to rebut an attack on the victim's credibility." *Id*. at 373. However, "expert witnesses may not testify that children overwhelmingly do not lie when reporting sexual abuse because such testimony improperly vouches for the complainant's veracity." *Thorpe*, 504 Mich at 235.

The present issues involve cross-examination testimony of Cottrell, the prosecution's expert on child-sexual-abuse dynamics. During the prosecutor's case-in-chief, Cottrell testified about children's differing responses to sexual assault, factors affecting a child's disclosure of sexual abuse, and features of memory related to traumatic events and to natural memory degradation. On cross-examination, defense counsel elicited from Cottrell an affirmation that he had handled 300 sexual-assault cases involving approximately 500 children and that he had supervised close to 3,000 additional such cases. Defense counsel then asked Cottrell whether he had reviewed any reports or looked at any evidence about the instant case, and Cottrell said that he had not. Cottrell testified that he had a 10-minute conversation with the prosecutor before trial, in which he learned that the alleged incident happened one time; the victim was seven years old; the alleged perpetrator was a family friend; disclosure was immediate, although he was not apprised of the exact timeframe; and the victim's family was supportive. At one point, defense counsel asked Cottrell, "[I]n your experience, have you dealt with children who may have been coached?" Cottrell responded, "It is rare that—in my experience, but yes." Defendant contends that Cottrell's testimony that it was "rare" for children to be coached to allege sexual assault constituted improper vouching for AM's credibility.

In *Thorpe*, 504 Mich at 240, 259, the Michigan Supreme Court held that Cottrell's testimony improperly vouched for the child victim's credibility by suggesting that it was extremely rare for children to lie about sexual abuse. In that case, Cottrell testified that it was "extremely rare" for children to lie about sexual abuse and that children lied about sexual abuse only 2% to 4% of the time. He then provided two scenarios when children might lie about sexual assault; neither scenario was relevant to the facts of the case. *Id*. The Supreme Court reasoned that, "although [Cottrell] did not actually say it, one might reasonably conclude on the basis of Cottrell's testimony that there was a 0% chance [that the victim] had lied about sexual abuse." *Id*. at 259. The Court also noted that "the prosecution's closing argument on rebuttal highlighted this improper evidence at a pivotal juncture at trial[.]" *Id*. at 259-260. The Court concluded that this

testimony likely affected the jury's decision, as the case was a credibility contest with no physical evidence or witnesses to the alleged assaults. *Id*. at 260. The Supreme Court reversed the judgment of this Court and remanded for a new trial. *Id*. at 266.

Cottrell's testimony in the present case is distinguishable from his testimony in *Thorpe*. Cottrell's answer to defense counsel's question regarding whether Cottrell had "dealt with children who may have been coached" was arguably nonresponsive. However, Cottrell's use of the term "rare" was less precise than his numbers-based testimony in *Thorpe*, and Cottrell affirmed that false disclosures did happen. Further, Cottrell's testimony did not foreclose the reasonable inference that this was one of those rare instances in which a child would lie about sexual abuse. Defense counsel emphasized during his cross-examination that AM's mother was the driving force behind the proceedings. Counsel elicited from AM's mother that it was she who reported what AM said, it was she who told her husband what AM said, it was she who took photographs of the scene, it was she who preserved AM's clothes, and it was she who went to the police station. Defense counsel returned to this theme in his closing argument when he observed that AM's mother was at the CAC interview and at the YWCA examination, but AM's father was not because he knew that something was amiss. In light of the testimony of AM's mother on cross-examination and the testimony of AM's father corroborating that he was not involved in AM's CAC interview and YWCA examination, the jury could reasonably have inferred that this might be one of the rare occasions when a child fabricated allegations of sexual abuse. In addition, neither party commented on the rarity (or not) of false disclosures during closing. Given the foregoing, defendant has not shown Cottrell's challenged response was plainly improper or that it affected the outcome of the lower-court proceedings. See *Carines*, 460 Mich at 763.

Defense counsel also asked Cottrell whether he had ever encountered a situation in which parents were divorcing and one parent coached a child to allege sexual assault against the other parent. Cottrell responded that he had probably run across that specific scenario only once. Although defendant asserts that Cottrell's response constituted improper vouching, no facts were adduced at trial that made the scenario relevant. Under these circumstances, a response to a scenario without factual basis in the present case did not improperly vouch for AM's credibility or prejudice defendant.

Lastly, defendant contends that meeting with the prosecutor before the trial tainted Cottrell's testimony as an expert witness. Defendant cites no authority for his position. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority."). Cottrell did not refer to AM's allegations, her disclosure of information, or the quality of her memory, and he stated that he could not give an opinion about anything that happened in this case. On this record, defendant has not established that Cottrell's testimony as an expert witness was tainted.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant raises several claims of ineffective assistance, none of which we find persuasive. As already indicated, our review of these claims is limited to errors apparent on the record. See *Seals*, 285 Mich App at 19-20. "If review of the record does not support the

defendant's claims, he has effectively waived the issue of effective assistance of counsel." *Sabin* (*On Second Remand*), 242 Mich App at 659.

Defendant argues that defense counsel rendered deficient performance when he was unaware of an updated police report that added a paragraph discussing how a buccal swab was obtained from defendant, and prejudice arose because defense counsel was not adequately prepared to cross-examine the investigating detective. Defendant does not indicate how having this information would have affected defense counsel's cross-examination of the investigating detective, what information counsel would otherwise have elicited, or how counsel's alleged deficiency deprived defendant of a fair trial. Absent any indication of a reasonable probability that having the supplemental paragraph would have affected the outcome of the proceeding, defendant's claim of ineffective assistance on the basis that defense counsel did not obtain the police report updated with the supplemental paragraph must fail. See *Trakhtenberg*, 493 Mich at 51.

Also without merit is defendant's claim that he received ineffective assistance of counsel because defense counsel (1) failed to explain to defendant that he was entitled to a probable-cause conference and a preliminary examination, and (2) waived defendant's right to these proceedings without defendant's consent. Assuming for the sake of argument that defense counsel waived the probable-cause conference without defendant's knowledge, defendant's signature on the form waiving the preliminary examination to preserve the plea offer that had been made indicated the importance that defendant placed on keeping open the possibility of reaching a plea agreement. Nothing in the record indicates that counsel's waiver of the probable-cause conference to allow for further plea bargaining was inconsistent with defendant's interests and wishes. Defendant has not shown that counsel's performance under the circumstances fell below an objective standard of reasonableness under prevailing professional norms. See *id*.

Further, defendant has not established prejudice arising from defense counsel's actions. The waiver did not affect defendant's ability to post bond or deprive defendant of the opportunity to reach a plea agreement. Given that defendant has not shown that, under these circumstances, defense counsel waiving the probable-cause conference was either deficient performance or prejudicial, and considering that defendant himself signed the form waiving the preliminary examination, defendant has established neither prong of his claim of ineffective assistance arising from counsel's actions regarding these proceedings. Therefore, defendant's claim must fail. See *id*.

Defendant also contends that defense counsel could not adequately advise him during the plea-bargaining stage of the proceeding because counsel was unaware that defendant was at risk of a statutorily mandated minimum sentence of 25 years if convicted of CSC-I. The right to the effective assistance of counsel applies to all critical stages of the proceedings if counsel's absence might deprive the defendant of a fair trial. See *People v Buie*, 298 Mich App 50, 61-62; 825 NW2d 361 (2012). This right includes the plea and sentencing stages. See *People v Pubrat*, 451 Mich 589, 594; 548 NW2d 595 (1996). In the context of a plea bargain, a defendant claiming ineffective assistance of counsel must demonstrate that counsel's performance was below an objective standard of reasonableness and that the poor performance prejudiced the defendant. See *Missouri v Frye*, 566 US 134, 140-141; 132 S Ct 1399; 182 L Ed 2d 379 (2012); *People v Douglas*, 496

Mich 557, 592; 852 NW2d 587 (2014). "The defendant has the burden of establishing the factual predicate of his ineffective assistance claim." *Douglas*, 496 Mich at 592.

Review of the record does not support defendant's claim. Rather, the record shows that both defense counsel and defendant signed a form waiving the preliminary examination in order to preserve a plea offer. The waiver that defense counsel and defendant signed indicated that if defendant pleaded, then the prosecution would "dismiss mandatory 25 year minimum." Clearly, both counsel and defendant were aware of defendant's sentencing exposure if convicted of CSC-I. As the record does not support defendant's claim, he has effectively waived the issue of effective assistance on the basis of his counsel's alleged ignorance of his sentencing exposure rendering counsel unable to give adequate advice during the plea-bargaining phase. See *Sabin* (*On Second Remand*), 242 Mich App at 659.

Lastly, defendant asserts that defense counsel rendered ineffective assistance by failing to negotiate a plea agreement after the prosecution indicated that it would remain open to negotiations. Assuming for the sake of this discussion that (1) counsel did not try to negotiate a better plea offer than the one on the table, and (2) this lapse constituted deficient performance, defendant has pointed to no record evidence establishing the prejudice prong of his claim of ineffective assistance. See *Trakhtenberg*, 493 Mich at 51. Even if the prosecutor would have made a better plea offer than the one that the prosecution extended, record evidence that defendant maintained his innocence and counted on the DNA evidence to exonerate him suggests that he would not have accepted a plea offer. See *Douglas*, 496 Mich at 595-598.

## C. EXCULPATORY EVIDENCE

Lastly, defendant argues that his right to due process was violated when the detective in charge of the investigation mishandled potentially exculpatory evidence. We disagree. As this issue is unpreserved, our review is for plain error affecting defendant's substantial rights. See *Allen*, 507 Mich at 604.

In order to establish a due-process violation when police mishandle or fail to preserve evidence, a defendant must show that the evidence was exculpatory or that the police acted in bad faith. See *People v Dickinson*, 321 Mich App 1, 16; 909 NW2d 24 (2017). "When the evidence is only potentially useful, a failure to preserve the evidence does not amount to a due-process violation unless a defendant establishes bad faith." *Id*. (quotation marks and citation omitted). Loss of such evidence that shows carelessness on the part of the police, but does not show gross negligence or intentional suppression, does not constitute a denial of due process. *People v Amison*, 70 Mich App 70, 79; 245 NW2d 405 (1976). "A prosecutor is not required to seek and find exculpatory evidence or assist in building the defendant's case . . . ." *Dickinson*, 321 Mich App at 16 (quotation marks and citation omitted). "Further, unless the defendant can show the suppression of evidence, intentional misconduct, or bad faith, the prosecutor and the police are not required to perform DNA testing to satisfy due process." *Id*.

Defendant has not argued that the police intentionally suppressed evidence, or that DNA testing of the underwear AM was wearing at the time of the assault would produce anything more than potentially useful evidence that "may have exonerated" him. Therefore, the pivotal question

is whether defendant has established that the investigating detective acted in bad faith. See *id*. He has not.

The evidence at issue is the underwear that AM was wearing at the time of the April 13 incident. Because AM was not wearing the same underwear when Solis examined her and collected a sexual-assault kit, Solis did not include the underwear in the kit. The detective submitted the underwear to the laboratory along with the kit, but in a separate container. However, the laboratory's policy was to analyze only what was inside the sealed kit unless the kit's contents did not provide a DNA sample sufficient to result in a DNA profile. Defendant's support for his claim that the detective acted in bad faith is the detective's statement that she tried to "sneak" the underwear in by putting it in a separate container and submitting it to the laboratory at the same time as AM's sexual-assault kit. Even if we accepted defendant's argument that this statement evinced bad faith, it would be bad faith directed toward the laboratory, not toward defendant, and in pursuit of trying to get the underwear tested, as defendant claims it should have been. The detective obviously would have preferred the underwear to be tested for DNA, given AM's disclosure that defendant put his hands down her pants. However, because the detective received the underwear into evidence before AM's medical examination, the underwear could not be included in the sexual-assault kit. The kit came to the police already sealed by Solis. The detective testified that she had never broken the seal on a kit, and that was why she said that she tried to "sneak the underwear in" by submitting it to the laboratory along with the kit, but in a separate container.

Given this record, defendant has not established a due-process violation from the detective's processing of the underwear that AM was wearing at the time of the assault. He has not established that the evidence would be more than probably useful, nor has he established that the detective acted in bad faith, suppressed evidence, or committed police misconduct. Therefore, defendant has failed to establish that his right to due process was violated. See *id*.

## VII. CONCLUSION

For the foregoing reasons, we conclude that the trial court did not plainly err by admitting Solis's testimony about what AM and AM's mother told her during AM's medical examination, nor did defense counsel render ineffective assistance by not objecting to Solis's admissible testimony. Defendant waived any claim of error arising from the trial court's decision to allow the prosecutor to play a portion of the videorecording, and defense counsel did not render ineffective assistance by failing to object to the admission of AM's videorecorded forensic interview because the foundational requirements were met to allow it to be played as a recorded recollection under MRE 803(5). Although the trial court erred by playing the audio of the forensic interview during deliberations, the error did not affect defendant's substantial rights. Defendant's claims of prosecutorial misconduct and ineffective assistance fail, and he waived any challenge to the trial court's jury instructions as given. Lastly, defendant has not established a due-process

violation arising from the investigating detective's processing of the underwear that AM was wearing at the time of the sexual assault.

Affirmed.

/s/ Mark T. Boonstra
/s/ James Robert Redford
/s/ Philip P. Mariani